1  Louis F. Teran (State Bar No. 249494)
   STRATEGIC LEGAL COUNSELING
2  lteran@strategiclegalcounseling.com
   1055 East Colorado Blvd., Suite #500
3  Pasadena, CA 91106
   Telephone:  (818) 484-3217 x200
4  Facsimile:  (866) 665-8877
   **Attorneys for Defendants**
5  **MIKE'S NOVELTIES, INC. and MANISCH CHANDER**

6

7                    UNITED STATES DISTRICT COURT

8                    CENTRAL DISTRICT OF CALIFORNIA

9                         WESTERN DIVISION

10 JAKE LEE, an individual           )  Case No.:  CV10-02225-JAK (JCx)
                                     )
11              Plaintiff,           )  **Hon. Judge John A. Kronstadt**
                                     )
12                                   )
                                     )  **DEFENDANTS' OPPOSITION TO**
13         vs.                       )  **PLAINTIFF'S MOTION FOR**
                                     )  **ENHANCED DAMAGES PURSUANT**
14                                   )  **TO 35 U.S.C. §284**
                                     )
15 MIKE'S NOVELTIES, INC. d.b.a.     )
16 MIKE'S WORLDWIDE IMPORTS, a       )  Complaint Filed:   March 26, 2010
   Texas Corporation; and           )  Trial Date:        December 13, 2011
17 MANISCH CHANDER, a.k.a. MIKE      )
18 CHANDER, a.k.a. MANISCH           )  **HEARING**
   CHANDRA, a.k.a. MIKE CHANDRA, an  )  Date:       April 2, 2012
19 individual                        )  Time:       8:30 AM
                                     )  Courtroom:  750 (7th Floor)
20                                   )
                                     )
21              Defendants           )
                                     )
22 _____)

23

24

25

26

27

28

# TABLE OF CONTENTS

I.  **INTRODUCTION**   -------------------------------------------------   1

II.  **ARGUMENT**   ----------------------------------------------------   2

A. **Defendants Did Not Infringe The '936 Patent And
The '936 Patent Is Invalid**   ------------------------------------   2

B. **Even If The Jury's Finding Of Patent Infringement And
Patent Validity Are Permitted To Stand, Enhanced Damages
Are Inappropriate Under** *Read*   -------------------------------   3

1.  *Deliberate copying*   -------------------------------------   4

2.  *Investigation of patent*   -----------------------------   8

3.  *Defendants' behavior during litigation*   -----------   11

4.  *Defendants' size and financial condition*   ---------   15

5.  *Duration of misconduct*   ---------------------------   16

6.  *Closeness of the case*   ------------------------------   16

7.  *Remedial actions taken*   ----------------------------   19

8.  *Defendants' motivation for harm*   -----------------   19

9.  *Concealment on part of infringer*   ------------------   20

III.  **CONCLUSION**   ---------------------------------------------------   24

1

## **TABLE OF AUTHORITIES**

2

**Cases**

3

*Atmel Corp. v. Silicon Storage Tech., Inc.*

4          202 F.Supp.2d 1096 (N.D. Cal. 2002)   ----------------------------          16

5

*Informatica Corp. v. Business Objects Data Integration, Inc.*

6          489 F.Supp.2d 1075 (N.D. Cal. 2007)   ----------------------------          18, 20

7

*Kloster Speedsteel AB v. Crucible, Inc.*

8          793 F.2d 1565 (Fed. Cir. 1986)   ----------------------------------          10

9

*Modine Mfg. Co. v. Allen Group, Inc.*

10          917 F.2d 538 (Fed. Cir. 1990)   ----------------------------------          3

11

*Ramos v. Biomet, Inc.*

12          1995 WL 540291 (Fed. Cir. 1995)   ----------------------------          19

13

*Read Corp. v. Portec, Inc.*

14          970 F.2d 816 (Fed. Cir. 1992)   ----------------------------------          3, 16

15

*Sharper Image Corp. v. Honeywell Int'l, Inc.*

16          222 F.R.D. 621 (N.D. Cal. 2004)   ----------------------------          3

17

*Slimfold Mfg. Co. v. Kinkead Indus., Inc.*

18          932 F.2d 1453 (Fed. Cir. 1991)   ----------------------------------          6

19

*State Indus., Inc. v. A.O. Smith Corp.*

20          751 F.2d 1226 (Fed. Cir. 1985)   ----------------------------------          6, 20

21

22

**Statutes and Rules**

23

35 U.S.C. §112   ----------------------   3

24

35 U.S.C. §284   ---------------------   1, 24

25

26

27

28

## I.      INTRODUCTION

Plaintiff's Jake Lee's Motion For Enhanced Damages Pursuant 35 U.S.C. §284 ("Motion") makes several allegations without any factual or legal bases whatsoever. Plaintiff fails to provide any clear and convincing evidence to show that this case merits the award of enhanced damages pursuant to the 9-factor *Read* test.

Plaintiff is the owner of the patent-in-suit which covers a tobacco pipe having a turret that is rotatably attached on to a manifold.  The claims in the patent-in-suit require that the turret remain stationary relative to the manifold because it is heavier in weight than the manifold.  In addition, the claims in the patent-in-suit require that the turret and manifold maintain a "non-binding" relationship with one another.

Defendants were found guilty of infringing the patent-in-suit for selling a tobacco pipe having a turret that is held stationary relative to the manifold by a spring and a ball bearing.  Defendants are not the designers or manufacturers of the accused product; they simply purchase the item in large quantities and resell them.  In essence, Defendants are simply independent distributors, not the designers or manufacturers of the accused product.  Nevertheless, Plaintiff decided to file suit against Defendants rather than against the designers and manufacturers of the accused product.

Throughout the litigation, Defendants were informed by the manufacturer of the accused product and reasonably believed that the accused product was not infringing the patent-in-suit.  Defendants believed that the spring and ball bearing added sufficient market and functional value to the product to make it a substantially different product in the eyes of the consumer.  Defendants also believed that the spring and ball bearing were sufficient additional features to "design around" the patent-in-suit.  After all, the turret in the accused product was held stationary because of the spring and ball bearing, not because it was heavier than the turret.  Secondly, the turret and the manifold in the accused product had a "binding" relationship with one another as they the turret could not spin like the turret in Plaintiff's patented product.

With their reasonable belief that they were not infringing the patent-in-suit,

1    Defendants cooperated fully with this litigation.  Defendants were truthful and candid
2    every step of the way, they did not have anything to hide as they truly believed they were
3    not infringing the patent-in-suit.  Throughout the entire litigation, Defendants did nothing
4    more than to vigorously defend themselves against Plaintiff's accusations.

5         As such, this case does not merit the award of enhanced damages pursuant to the 9-
6    factor *Read* test.

7    **II.      ARGUMENT**

8    **A. Defendants Did Not Infringe The '936 Patent And The '936 Patent Is Invalid**

9         For reasons outlined in Defendants' Renewed Motion For Judgment As A Matter
10   Of Law Or, Alternatively, Motion For New Trial On Patent Infringement ("JMOL
11   Infringement Brief") (Docket Item #181), the jury's finding of patent infringement should
12   be set aside as a matter of law.  As noted in Defendants' JMOL Infringement Brief,
13   Plaintiff failed to produce any evidence whatsoever in the trial record regarding whether
14   the turret in the accused product remains in a stationary position because it is heavier than
15   the manifold.  In other words, Plaintiff had the burden to show that the turret in the
16   accused product was heavier in weight than the manifold, such that it maintains a
17   stationary position.  However, at trial, Plaintiff failed to meet his burden of proof of
18   infringement.

19        During trial, Plaintiff did not present any evidence at all whatsoever to show that
20   the weight of the turret in Defendants' product is sufficiently heavy compared to the
21   weight of the manifold to maintain it in a stationary position.  During Plaintiff's
22   testimony, Plaintiff merely showed that the accused product has a turret that is heavier
23   than the weight of the manifold.  Plaintiff's attorney used a digital scale to show to the
24   jury that the weight of the turret in the accused product was heavier in weight than the
25   manifold.  However, Plaintiff never presented any evidence at all whatsoever to show that
26   this weight difference between the turret and manifold was sufficient to maintain the
27   turret in a stationary position.

28        In addition, for reasons outlined in Defendants' Renewed Motion For Judgment As

1    A Matter Of Law Or, Alternatively, Motion For New Trial On Patent Invalidity ("JMOL

2    Invalidity Brief") (Docket Item #182), the jury's finding of patent validity should be set

3    aside as a matter of law.  As noted in Defendants' JMOL Infringement Brief, Plaintiff's

4    own trial testimony provides clear and convincing evidence that the '936 Patent is invalid

5    as it fails to meet the (1) enablement requirement, (2) written description requirement, and

6    (3) best mode requirement of 35 U.S.C. §112.

7        **B. Even If The Jury's Finding Of Patent Infringement And Patent Validity Are**

8              **Permitted To Stand, Enhanced Damages Are Inappropriate Under *Read***

9              The jury's function was to determine infringement and actual damages, and its

10   determination of willfulness is only advisory to this Court.  See *Modine Mfg. Co. v. Allen*

11   *Group, Inc.,* 917 F.2d 538, 543 (Fed. Cir. 1990)("[A] finding of willful infringement

12   merely *authorizes*, but does not *mandate*, an award of increased damages")(emphasis in

13   original).  The state of the trial record in this case shows that no reasonable jury could

14   find Defendants infringed the patent-in-suit nor could a reasonable jury find that the

15   patent-in-suit is valid.  Therefore, the jury's willfulness findings should be set aside.  But

16   in the event this Court declines to set aside these findings, the jury's damages award

17   should not be enhanced.  Not only is this case a close call regarding any finding of

18   willfulness, but the 9-factor *Read* test – when correctly applied – weighs heavily against

19   awarding enhanced damages.  See *Read Corp. v. Portec, Inc.,* 970 F.2d 816, 827-828

20   (Fed. Cir. 1992) (setting out nine non-exclusive factors courts have considered when

21   determining whether to enhance damages and noting that use of the factors in patent cases

22   is "in line with ***punitive damage considerations*** in other tort contexts") (emphasis added);

23   *Sharper Image Corp. v. Honeywell Int'l, Inc.,* 222 F.R.D. 621, 628 (N.D. Cal. 2004)

24   ("The primary purpose of enhancing compensatory damages are punishment and

25   deterrence – and the primary factors courts are to consider when deciding whether to

26   enhance damages are designed to assess the degree of the defendant's culpability (rather

27   than the extent of the plaintiff's loss").  We address each of the nine *Read* factors below.

28

OPPOSITION TO MOTION FOR ENHANCED DAMAGES          CASE NO. CV10-02225-JAK (JCx)

***1.  Deliberate Copying***

Plaintiff's motion to enhance damages alleges, with zero factual basis, that Defendants copied the patent-in-suit.  The record is clear that Defendants do not design, manufacture, or produce any products whatsoever.  Defendants simply purchase various types of products in large quantities and then resell them in smaller quantities for a profit. In essence, Defendants operate a wholesale distribution business, not a product manufacturing business.

Furthermore, Plaintiff's motion alleges, with zero factual basis, that Defendants purchased and resold "an exact copy" of the patented pipe.  See *Motion,* p.5:12-14.  In fact, during trial and in all of the briefs filed with the Court in this lawsuit, Defendants acknowledged that they sold a tobacco pipe that is similar but not "an exact copy" of the patented pipe.  Defendants acknowledged that they sold a tobacco pipe having a spring and a ball bearing that allowed the turret to be held in place relative to the manifold while the pipe was in use.  Thus, the user has to overcome the pressure exerted by the spring and ball bearing to rotate the turret.  On the other hand, the patented pipe does not have a spring and/or a ball bearing at all whatsoever.  In fact, the turret in the patented pipe is free to rotate relative to the manifold.  During trial, Defendants' attorney demonstrated this to Plaintiff by making the turret in the patented pipe spin.  Then Plaintiff acknowledged during his trial testimony that the turret in the accused pipe cannot spin like the turret in the patented pipe because it is held in place by the spring and ball bearing.  Plaintiff's trial testimony was as follows:

> "Q:  I'm looking at exhibit 101 previously shown by your counsel.
> CLERK:  101-A?
> Mr. Teran (Defendants' counsel):  101.
> Q:  This is the pipe that you manufacture and sell; is that correct, Mr. Lee?
> A:  Yes.
> Q:  And when I rotate the turret in this pipe, there is no clicking sound; Is that correct?
> A:  Correct.
> Q:  In fact, if I flick my finger, I can make the turret of this pipe spin; Is that correct, Mr. Lee?
> A:  Yes.

Q: If I take 101-B, if I flick my finger at the turret, it doesn't spin; Is that correct?
A: Well, that's not how you would normally turn the six shooter pipe.
Q: I understand –
A: I could do that too.
Q: Would you like to try to flick the turret?
A: No. I can make it look like however I want to make it too.
Q: Let me –
THE COURT: What's the question, please?
Mr. Teran: The question is, if the turret can spin the same way as exhibit 101 can spin.
THE COURT: Do you understand the question?
A: Yes.
THE COURT: Could you answer that, please?
A: No it cannot spin with the flick of your finger. But it could still turn normally like how you would turn the cylinder." *See Teran Decl.,* Ex. D.

The added spring and ball bearing in the accused pipe is of substantial importance in this case. The spring and ball bearing adds functional value to the product. The turret in the patented pipe can easily move or change position inadvertently while being used. This results in user frustration as the turret has to be realigned every time the user wishes to take smoke from the pipe. On the other hand, the spring and ball bearing in the accused pipe allows the turret to maintain its position without the need for any realignment or inadvertent rotation of the turret. As Defendant testified at trial, the accused pipe with the spring and ball bearing is perceived by consumers as a superior product. The market demand for the accused pipe is greater because it is not seen by consumers as being the same pipe as the patented pipe. The spring and ball bearing create a clear distinction for consumers. Thus, the accused pipe cannot be "an exact copy" of the patented pipe.

In fact, the actual manufacturer of the accused product was aware of the patent-in-suit and was also aware of a market demand for a product that looked and functioned like Plaintiff's product. Thus, the actual manufacturer decided to "design around" the patent-in-suit. A claim requirement of the patent in suit was that the turret must be maintained stationary because it is heavier than the manifold. So, the manufacturer of the accused

1    product attempted to avoid infringement of this claim requirement by adding a spring and

2    ball bearing to hold the turret stationary rather than rely on the weight of the turret.

3    Defendants then purchased the accused product with the spring and ball bearing so as not

4    to infringe the patent-in-suit and capitalize on the market value of the added spring and

5    ball bearing.

6            As such, there was a specific change made to the accused product to avoid

7    infringement of the patent-in-suit.  It has often been noted that the benefits of the patent

8    system is the incentive it provides for "designing around" patented inventions, thus

9    creating new innovations.  See *Slimfold Mfg. Co. v. Kinkead Indus., Inc.,* 932 F.2d 1453,

10   1457 (Fed. Cir. 1991); Also see *State Indus., Inc. v. A.O. Smith Corp.,* 751 F.2d 1226,

11   1235-36 (Fed. Cir. 1985).

12           Of course, determining when a patented device has been "designed around"

13   enough to avoid infringement is a difficult determination to make.  One cannot know for

14   certain that changes are sufficient to avoid infringement until a judge or jury has made

15   that determination.  Thus, the question which must first be answered in this case with

16   respect to enhanced damages is whether Defendants proceeded without reasonable belief

17   that it would not be held liable for patent infringement.

18           As discussed above and extensively at trial, the claims of the patent-in-suit clearly

19   require that the turret be held stationary because it is heavier than the manifold.  The

20   accused product has a turret that remains stationary by a spring and ball bearing.

21   Secondly, the claims in the patent-in-suit also require that the there be a "*non-binding*"

22   relationship between the turret and manifold.  The accused product has a spring and a ball

23   bearing that bind the turret in place, thus creating a "*binding*" relationship between the

24   turret and manifold.  Therefore, Defendants proceeded with reasonable belief that they

25   would not be held liable for patent infringement.

26           However, Plaintiff still insists that Defendants sold "an exact copy".  Plaintiff

27   wishes the Court to forget all about the accused pipe that has the spring and ball bearing.

28   Instead Plaintiff wishes the Court to only focus on the accused pipe that does not have a

spring and ball bearing.  Plaintiff alleged that Defendants sold an accused product that did not have a spring and ball bearing.  However, Defendants have adamantly denied this allegation throughout this lawsuit and during trial.  Defendants have acknowledged that the only product they sold was the version with the spring and ball bearing.  During trial, Plaintiff was unable to present any reliable evidence that Defendants sold any pipes other than the one with a spring and ball bearing.  In fact, Plaintiff's own trial testimony states:

> "Q:  Other than this pipe, the pipe that you received, have you gotten your hands on any other pipe that came from Defendants that did not have a spring and ball bearing?
> Mr. Dushane (Plaintiff's Counsel):  Objection.  Speculation.
> THE COURT:  Overruled.  You may answer.
> A:  There were one or two other shows that I saw a pipe with a ball and the spring at his booth after 2006.
> Q:  Mr. Lee, but the question is, did you ever get your hands on any other pipe, get your hands on, not saw, but actually get a pipe from Defendants that did not have a spring and a ball bearing?
> A:  What do you mean by "get"?  Take with me?  Pick it up?
> Q:  Sure.
> THE COURT:  Which?
> Q:  Take with you.
> THE COURT:  Do you understand the question?
> A:  Yes.
> THE COURT:  You may answer.
> A:  I don't believe so.
> Q:  Have you encountered any other individual that received a pipe from the Defendants that did not have a spring and a ball bearing?
> A:  Have I encountered anybody that got one from – No, I have not encountered anybody.  In person?  I'm not understanding – I'm not understanding your question, I'm sorry.
> Q:  Do you know anybody that has acquired a pipe from Defendants that doesn't have a spring and a ball bearing?
> A:  Not that I know of.  Sorry, it's only been referred to me as a copy of my pipe." *See Teran Decl.,* Ex. E.

Accordingly, Plaintiff was not able to present any evidence that Defendants sold any accused pipe without the spring and ball bearing.  Defendants adamantly deny selling any pipe without the spring and ball bearing.  The spring and ball bearing were added to "design around" the patent-in-suit.  Defendants had a reasonable belief that they would

1   not be held liable for patent infringement because the spring and ball bearing were

2   sufficient to "design around" the patent-in-suit.  Therefore, the damages in this case must

3   not be enhanced.

4            ***2.  Investigation of Patent***

5            Plaintiff makes the incredulous statement that "[Defendants] did nothing to

6   investigate the scope and validity of Mr. Lee's patent after he became aware of the

7   patent."  See *Motion*, p.5:19-20.  This statement is nothing more than amazingly

8   disingenuous.  The truth is that Defendants did, in fact, take measures to investigate the

9   patent-in-suit and Plaintiff's infringement concerns.  After being notified by Plaintiff that

10  the product may be infringing the patent-in-suit, Defendants contacted the manufacturer

11  of the accused product, the people that sold Defendants the item.  Defendants were

12  informed that the spring and ball bearing were added to "design around" the patent-in-suit

13  and to make a better product than Plaintiff's item.

14           Thus, Defendants investigation of the patent-in-suit entailed discussions with the

15  manufacturer of the accused product.  After all, Defendants did not design or manufacture

16  the accused product, all they did was purchase and resell the item.  Secondly, Defendants

17  physically compared the accused product with Plaintiff's product.  After its investigation,

18  Defendants were reasonably satisfied that the product they were selling with the spring

19  and ball bearing was not the same product protected by the patent-in-suit.  The spring and

20  ball bearing added market and functional value that Plaintiff's patented product lacked.

21  As such, Defendants acknowledged that they continued to sell the accused product with

22  the spring and ball bearing despite Plaintiff's repeated warnings and notices.

23           Plaintiff references Mr. Chander's deposition to support his allegation that

24  Defendants "did nothing to investigate".  See *Motion,* p.5:19-20.  But, in fact, Mr.

25  Chander's deposition testimony is as follows:

26           "Q:  So prior to that, you have never had an attorney give any opinion at all
              regarding whether or not you were infringing Mr. Lee's patent?
27           A:  No, because I was not infringing.
             Q:  So you just made that determination on your own?
28           A:  He said, I'm selling – he told me, You're selling my pipe.

OPPOSITION TO MOTION FOR ENHANCED DAMAGES          CASE NO. CV10-02225-JAK (JCx)

1   Q:  Right.
2   A:  And I'm telling him, I'm not selling his pipe.
    Q:  You told him that?
3   A:  Yeah.
4   Q:  Specifically, you said, I'm not selling your pipe?
    A:  Yeah, I'm not selling your pipe.
5   Q:  Because it clicks?
6   A:  Yeah.  I'm not – I told him I'm not – I told him and he knows I told him,
    I'm not selling your pipe.  I told him that.
7   Q:  And you said because it clicks.  That's the reason why you are not selling
8   his pipe?
    MR. TERAN (Defendants' counsel):  Counsel, I think he answered the question
9   –
    MR. DUSHANE (Plaintiff's counsel):  No, he didn't answer –
10  MR. TERAN:  -- over and over again.
11  MR. DUSHANE:  You are not answering the question.
    MR. TERAN:  He did.  He said –
12  MR. DUSHANE:  You are being evasive.  My question is – and I'm going to
13  finish it and then you can make your objection.
    MR. TERAN:  Stop yelling at me.  I'm not going to answer if you are yelling at
14  me.
15  MR. DUSHANE:  I'm not yelling.
    MR. TERAN:  I'm going to instruct my client not to answer any more
16  questions, and we are going to walk out of here, if you continue yelling the way
17  you are yelling.
18  Q:  Did Mr. Lee – did you tell Mr. Lee that you were not selling his pipe
    because you were selling a pipe that was clicking?
19  A:  I just said, I'm not selling your pipe.
20  Q:  When did you tell him that?
    A:  When he asked me.
21  Q:  When did he ask you?
22  A:  At some show.
    Q:  What show?
23  A:  I told you, I don't remember which show.  I don't recall which show it was.
24  I mean –
    Q:  Was it only one?
25  A:  I don't remember.
26  Q:  You don't remember if on multiple occasions he told you not to sell his
    pipe?
27  A:  I'm trying to conduct my own business.  I've got thousands of items that
    I'm focusing on.  Jake Lee is not the person that I'm focusing on.  I don't want
28  to hurt his business.  I'm not trying to infringe on his product.  I'm just trying to

OPPOSITION TO MOTION FOR ENHANCED DAMAGES        CASE NO. CV10-02225-JAK (JCx)

do my business.

Q:  But if you were told to stop selling his pipe and he claimed it was patented, why did you – did you continue selling it because, in your mind, at the time, you weren't selling the pipe, because it was clicking.  Is that right?

A:  No.  I always – I looked at his pipe and I looked at my pipe and they were two different pipes.  They are different pipes.

Q:  And you made this –

A:  I am not selling the pipe Jake Lee is selling.  I am selling a different pipe.

Q:  When did you make that determination?

A:  When he told me.

Q:  Every time?  Did you ever bring it to Jake Lee's attention as to why you had an opinion that you were selling a different pipe?

A:  I didn't care to talk to Jake Lee.  He is not – he is my competitor and he keeps making threatening comments, I'm going to take you to court.  I mean, it was not a normal conversation every time with Jake Lee.

Q:  If it was so insignificant and he was threatening to take you to court, why did you continue to sell the pipe?

A:  Because I had other stuff to think about.

Q:  But you didn't think it was a problem –

A:  I wasn't infringing.

Q:  You believed that you weren't infringing, because –

A:  I know I wasn't infringing.

Q:  You know you were not infringing?

A:  Yes.

Q:  And when did you know you were not infrining?

A:  I knew it from the beginning.

Q:  Because you understand patent law.  Right?

A:  No, because mine had the spring and the ball and the clicking mechanism."
*See Teran Decl.,* Ex. F.

Thus, Defendants had conducted enough investigation to be reasonably certain that the accused product did not infringe due to the added spring and ball bearing.  More important , Defendants did not design or manufacture the accused product, they only sold the pipe.  They relied on the information given to them by the manufacturer.  It is true that Defendants did not initially consult an attorney for legal advice.  The Courts have determined that the absence of legal advice does not mandate enhanced damages.  See *Kloster Speedsteel AB v. Crucible, Inc.,* 793 F.2d 1565, 1579 (Fed. Cir. 1986).  Defendants in this case reasonably believed they did not need to seek legal advice.  They

did not design or manufacture the accused product, they were informed by the manufacturer that the spring and ball bearing was a "design around" the patent-in-suit, and they physically compared the accused product and Plaintiff's product to determine that substantial differences exist between the two.  As Mr. Chander testified repeatedly, the accused product is not the same product as Plaintiff's product.

Defendants did not deliberately wish to harm Plaintiff, they were simply running a business and trying to stay ahead of the competition.  Plaintiff is Defendants' competitor and Defendants were competing by selling a superior product.  As such, enhanced damages are not appropriate in this case.

### 3. Defendants' Behavior During Litigation

Plaintiff begins his argument for this section with the following remarkable statement:

> "Mr. Chander and MWI engaged in frivolous and dilatory litigation tactics to attempt to intimidate Plaintiff from going forward with his case on the merits." See *Motion,* p.6:6-7.

This statement is disingenuous given Plaintiff's behavior from the beginning. First, Plaintiff repeatedly attacked Defendants at various trade shows with accusations of patent infringement.  Plaintiff did not only complain about the accused product.  Plaintiff attacked Defendants for selling various other products in addition to the accused product. These accusations were completely baseless since Plaintiff never owned any patents for any of the other products.  But most despicable about Plaintiff's behavior is that he made these accusations in a loud and angry tone in the middle of a trade show and in front of Defendants' customers, as testified in trail by Plaintiff's one and only salesperson.

Second, Plaintiff sent an email to Defendants demanding that they stop selling a list of three items, one of which was the accused product.  See *Teran Decl.,* Ex. A.  The other two items were products for which Plaintiff had no patent or any intellectual property rights.  Plaintiff had no right to demand Defendants to stop selling the other items.

Third, immediately upon filing this lawsuit, Plaintiff's counsel contacted

- 11 -

Defendants directly to demand $115,000 or else.  Defendants asked for some time to hire an attorney before providing a response.  Instead of giving Defendants a reasonable amount of time to seek legal advice, Plaintiff's counsel sent Defendants an email demanding $115,000 within 48 hours or else.  See *Teran Decl.,* Ex. B.  In the email, Plaintiff's counsel made the following egregious threat:

> "Mr. Lee expects to be awarded $162,000 in damages through a judgment against you personally and MWI, in addition to his attorney's fees, which could easily exceed $75,000 through trial.  As such, we estimate your exposure to damages and attorney's fees to be not less than $237,000 and have discounted that sum by nearly 50% to avoid further litigation and settle this case forthwith."  See *Id.*

Clearly, Plaintiff never intended to move "forward with his case on the merits".  Plaintiff used the Complaint as extortion against Defendants like a school yard bully without interest on the merits of the case.  Plaintiff did everything in his power to prevent Defendants from attaining legal counsel on the matter.  When Defendants stated that they needed time to find an attorney, Plaintiff, in essence refused to give them time and instead insisted on an answer within 48 hours.  This is a classic case where Plaintiff asserts an overly inflated damages model and offers to settle for pennies on the dollar, which is far less than the cost of the defense.  Thus, Plaintiff did not intend to move forward "on the merits".  Instead, Plaintiff sought to coerce a nuisance value settlement.  Such practice is an abuse of the judicial system and threatens the integrity and respect of the courts.

After Defendants finally retained an attorney and after Defendants' counsel explained to Plaintiff why the accused product was not infringing the patent-in-suit, Plaintiff reacted irrationally by amending the Complaint with an additional cause of action for trademark infringement for the mark "six shooter".  See *First Amended Complaint,* Docket Item #22-1.  Plaintiff added this cause of action knowing that he never even filed a trademark application for the mark.  Plaintiff's action was an irrational and malicious response against Defendants for having retained an attorney instead of accepting the $115,000 settlement offer.  This trademark infringement cause of action was dismissed in summary judgment after Plaintiff utterly failed to provide any evidence at all

1   whatsoever that the "six shooter" was a valid trademark.  See *Summary Judgment Order,*

2   Docket Item #97.  Plaintiff's irrational and malicious conduct did nothing more than

3   harass, intimidate, and increase the cost of litigation.

4          Then, after Plaintiff realized that its trademark infringement claim was being

5   derailed, Plaintiff again amended the Complaint to add a claim for false advertisement.

6   Although the false advertisement claim survived summary judgment, the Court found that

7   Plaintiff had not suffered any damages.  Again, this added claim was Plaintiff's way to

8   harass, intimidate, and increase the cost of litigation.

9          Plaintiff makes the baseless assertion that Defendants' Rule 11 motion for

10  sanctions was inappropriate.  However, Plaintiff fails to acknowledge that he made the

11  same argument in his opposition papers to the motion.  In fact, Plaintiff sought

12  Defendants to be sanctioned for filing the Rule 11 motion.  Although the Court denied the

13  Rule 11 motion, it did point out that merit for sanctions against Defendants was not

14  shown.  See *Rule 11 Order,* Docket Item #93, p.3.  Thus, Defendants' motion was not

15  misconduct but part of their efforts to defend themselves from Plaintiff's accusations.

16         Then Plaintiff makes another baseless assertion that Defendants' conduct during

17  Mr. Chander's deposition in Houston, Texas was inappropriate.  However, in its brief

18  description of the facts, Plaintiff disingenuously neglects to mention that prior to the start

19  of the deposition, at the hotel lobby, Plaintiff verbally abused and attempted to intimidate

20  Mr. Chander.  Plaintiff neglects to mention that Defendants' counsel had to intervene and

21  allow the parties to separate for two hours so that the parties could cool off and the

22  deposition could proceed.  Defendants' counsel took Mr. Chander away from the

23  deposition site for some coffee so that tempers could ease enough to proceed with the

24  deposition.  In fact, when Magistrate Judge Choolijian managed to get involved, she

25  recognized the tension and ordered the deposition to proceed with Mr. Lee seated away

26  from Mr. Chander.  Defendants did not delay the deposition, it was Mr. Lee's despicable

27  verbal abuse and intimidation of Mr. Chander that nearly derailed the entire day.

28         Next, Plaintiff complains about an *ex parte* application filed by Defendants due to

1    the Plaintiff's refusal to proceed with mediation.  The truth is that Defendants proposed 3

2    qualified mediators from ADR Services, Inc.  The parties then agreed on one of the

3    mediators.  Defendants scheduled the agreed upon mediator.  Then at the last minute,

4    Plaintiff decided he did not want to participate in the mediation because the mediator's

5    fees were too high.  This refusal to participate was asserted by Plaintiff after the parties

6    had met and conferred to agree on the mediator and after the mediator had been

7    scheduled.  At the last minute, Plaintiff decided he did not want to participate in the Court

8    ordered mediation.  Thus, Defendants filed the *ex parte* application.  See *Docket Item*

9    *#107*.  Again, Plaintiff's despicable conduct instigated this entire matter.

10        Next, Plaintiff complains about a couple of settlement offers that were made by

11   Defendants during the litigation in an effort to resolve the dispute.  There is nothing

12   wrong with making settlement offers to resolve lawsuits so as to avoid the uncertainty of a

13   jury trial.  In fact, many courts encourage such attempts to settlement.  Defendants'

14   settlement offers were always delivered to Plaintiff's counsel and with reasonable time to

15   evaluate the offer.  Unlike Plaintiff's initial settlement offer that demanded a response

16   within 48 hours and that was sent directly to Defendants knowing that they did not have

17   legal counsel yet, Defendants' settlement offers cannot be seen as an attempt to extort

18   Plaintiff.  Thus, Defendants' conduct was not inappropriate in any way.

19        Finally, Plaintiff complains that "Defendants' counsel threatened to report

20   [Plaintiff's counsel]…to the California and New York State Bars, but apparently did not

21   follow through on his threats".  See *Motion,* p.6:27-7:1.  However, Plaintiff conveniently

22   leaves out the facts that led Defendants' counsel to make these threats.  Plaintiff

23   conveniently leaves out that these threats were instigated when Defendants were flooded

24   with telephone calls from its customers complaining they were being harassed and

25   threatened with litigation by Plaintiff's counsel for refusal to cooperate with Plaintiff and

26   testify against Defendants.  Many of Defendants' customers threatened discontinue

27   business with Defendants for fear of litigation.  It is amazing how Plaintiff conveniently

28   neglects to state that Plaintiff's counsel one day decided to call several of Defendants'

OPPOSITION TO MOTION FOR ENHANCED DAMAGES        CASE NO. CV10-02225-JAK (JCx)

1  customers with threats of litigation and other despicable accusations.  See *Teran Decl.,*
2  Ex. C.  Plaintiff's counsel crossed the line when he decided not to simply investigate but
3  to threaten others to testify against Defendants.  In response to Plaintiff's counsel
4  despicable tactics, Defendants contacted Defendants' counsel in absolute desperation as
5  their customers were being harassed and threatened.  Defendants' counsel had no choice
6  but to forcefully remind Plaintiff's counsel of his professional responsibilities and to
7  threaten with a complaint filed with the California and New York State Bars.  Defendants'
8  counsel never followed through with his threats because Plaintiff's counsel realized the
9  mistakes he had made and decided not to threaten and harass any more of Defendants'
10  customers.

11      Accordingly, Defendants' behavior during litigation was appropriate throughout
12  the lawsuit.  As discussed above, Defendants truly and reasonably believed that the
13  accused pipe was an effective "design around" the patent-in-suit.  Defendants reasonably
14  believed that they were not infringing the patent-in-suit.  As such, Defendants did not
15  have any reason to behave unprofessionally or to hide any information.  Defendants
16  cooperated with the judicial process and followed every law and rule in an exemplary
17  manner throughout the entire lawsuit.

18              *4.  Defendants' size and financial condition*

19       Plaintiff correctly points out the overall financial status of Defendants' business.
20  However, Plaintiff conveniently fails to mention that Defendants sold over 7,000 different
21  types of products to account for the $5.8 million revenue in 2010.  This case involves only
22  1 of the 7,000 different products that Defendants sell.  As presented by the chart used at
23  trial and to which the parties stipulated, Defendants generated $3,244 of their $5.8 million
24  sales revenue in 2010 by selling the accused pipe.  See *Teran Decl.,* Ex. C.  Thus, sales of
25  the accused pipe accounts for 0.06% of Defendants total sales revenue for 2010.  This
26  clearly shows that Defendants' sale of the accused pipe is nothing more than a small
27  fraction of their overall non-infringing business.  The Courts have consistently found that
28  the non-infringing portion of a business should not be prejudiced by the damages

1    incurred.  So this *Read* factor weighs against enhancing damages.  See *Read Corp. v.*
2    *Portec, Inc.,* 970 F.2d 816, 827 (Fed. Cir. 1992).

3              **5.  Duration of misconduct**

4           It is questionable whether this *Read* factor is relevant to the present case.  "As to
5    the duration of the misconduct, this factor seems to apply when an infringer ignores the
6    Court's admonition not to engage in infringing conduct after a stay of an injunction."
7    *Atmel Corp. v. Silicon Storage Tech., Inc.,* 202 F.Supp.2d 1096, 1108 (N.D. Cal. 2002).
8    There has been no injunction or stay of an injunction in this litigation.  But even if this
9    factor should be examined in this action, it does not weigh in favor of enhanced damages.

10          As discussed in detail above, Defendants did not design or manufacture the
11   accused product, they simply sold the item.  But, upon being notified of the potential
12   infringement, Defendants contacted the manufacturer of the product to seek guidance and
13   advice.  The manufacturer explained that the added spring and ball bearing provides for a
14   sufficient "design around" the patent-in-suit.  In addition, Defendants carefully inspected
15   and compared the accused product to Plaintiff's product.  Defendants recognized the
16   market and functional value that was added by the spring and ball bearing.  Thus,
17   Defendants reasonably believed that they were not infringing the patent-in-suit.  In fact,
18   Defendants took precautionary steps to only sell the pipe with the spring and ball bearing.
19   Plaintiff has been unable to present any reliable evidence at trial to substantiate his
20   allegation that Defendants sold the version without the spring and ball bearing.  In fact,
21   Defendants informed Plaintiff in several occasions that they were "not selling [Plaintiff's]
22   pipe".  Thus, this *Read* factor weighs against enhanced damages.

23             **6.  Closeness of the case**

24          This lawsuit has lasted for almost 2 years.  Plaintiff's allegations have evolved
25   dramatically since he first sent his cease and desist email notice on October 20, 2008,
26   which reveals how close this case is and has been.  This lawsuit was filed with 3 causes of
27   action:  1) patent infringement; 2) trademark infringement; and 3) false advertising.  The
28   Court summarily dismissed the trademark infringement claim on grounds that Plaintiff

1   was wholly unable to present any evidence that it owned a valid trademark.  Then the

2   Court summarily found that Plaintiff did not suffer any damages related to the false

3   advertising cause of action.  Plaintiff has not challenged any of these summary judgment

4   rulings in its post-trial motions.

5          With regard to the patent infringement cause of action, Plaintiff's allegations have

6   also evolved dramatically since the start of the case.  First, the Complaint states:

7   "Defendants MWI and Chander have been, and currently are, ***directly*** infringing the '936

8   Patent…"  See *SAC,* Docket Item #62, ¶12.  At the pre-trial conference, Plaintiff amended

9   the Complaint with allegations of ***indirect*** infringement.  See *Motion in Limine No. 1,*

10  Docket Item No. 123.  In its Disclosure of Asserted Claims and Infringement Contentions

11  pursuant N.D. Patent Local Rules 3-1 and 3-2, Plaintiff alleged that Defendants only sold

12  the product having a spring and a ball bearing.  See *Motion in Limine No. 2,* Docket Item

13  No. 124.  But at the pre-trial conference, Plaintiff amended his allegations to accuse

14  Defendants of selling an accused product without the spring and ball bearing.  See *Motion*

15  *in Limine No. 2,* Docket Item No. 124.

16         Furthermore, Plaintiff's theory of patent infringement evolved significantly since

17  the beginning of trial.  Plaintiff filed a Motion for Summary Judgment for Patent

18  Infringement with the following argument:

19         "Defendants also argue that they do not infringe Plaintiff's patent since their
20         turret is not held in place "because" it is heavier than their manifold.  However,
           the word "because" is not in claim 1 or 11.  The claims merely recite that one
21         part is heavier than the other.  That is all that is required for infringement."  See
           *Plaintiff's MSJ,* Docket Item #78-1, p.8:11-15.
22

23         Plaintiff's motion for summary judgment was not only denied by the Court, but the

24  Court felt compelled to state the following:

25         "Plaintiff objects to Defendants' asserted genuine issue of material fact #24:
26         'The ordinary and customary meaning of the term 'such that' and 'so that', as
           they appear in claims 1 and 11 of the '936 Patent, respectively, indicate that the
27         turret shall remain stationary ***because*** the turret is heavier than the manifold.'
           The Court **OVERRULES** this objection, as Plaintiff has not sufficiently shown
28         that this is inadmissible argument, speculative, and conclusory, especially as

1   Defendants' allegedly undisputed fact is supported by this Court's Claim
2   Construction Statement."  See *MSJ Order,* Docket Item #89, p.5.

3   Even during trial, Plaintiff continued to push its argument that "the claims merely
4   recite that one part is heavier than the other.  That is all that is required for infringement."
5   With this erroneous argument, Plaintiff managed to even confuse the Court into using the
6   following incorrect jury instruction:

7   "The Court had decided that the phrase 'wherein said turret is of heavier weight
8   than the weight of said manifold, such that said turret remains in a stationary
    position upon said manifold in any particular relative rotation between said
9   turret and said manifold' does not mean the turret is maintained in a stationary
10  position relative to the manifold only by the frictional forces between the turret
    and the manifold.  The Court has also decided that the phrase does not exclude
11  a pipe that has a ball or spring."  See *Docket Item #156.*

12  The Court later corrected its error but not after causing irreparable harm to
13  Defendants' defense.  Nevertheless, the fact that Plaintiff's argument for infringement
14  evolved and the fact that even the Court was confused as to the interpretation of claims 1
15  and 11 of the patent-in-suit shows that this case was a close call.

16  Furthermore, Plaintiff correctly points out that the jury unanimously found
17  infringement and validity of the patent.  However, the jury overwhelmingly disagreed
18  with the Plaintiff's estimate for damages.  Plaintiff asked the jury to find damages in the
19  amount of over $750,000.  But, in fact, the jury found damages in the amount of $40,000,
20  a fraction of what Plaintiff requested.  Nevertheless, the mere fact that the jury found
21  against the Defendants is not enough to show that Defendants committed an egregious act
22  that underlies a grant of enhanced damages.  See *Informatica Corp. v. Business Objects
23  Data Integration, Inc.,* 489 F.Supp.2d 1075, 1085 (N.D. Cal. 2007) ("Although the jury
24  resolved these [infringement and validity] issues in favor of Informatica, this result is not
25  determinative of whether the questions were closely balanced and hotly contested.").

26  Because of the closeness of the facts in this case, and because of the steady
27  reduction in and narrowing of Plaintiff's legal theories during the course of this suit, this
28  *Read* factor weighs against enhancement of damages.

1          ***7.   Remedial actions taken***

2          As discussed above, Defendants took comprehensive steps to investigate Plaintiff's

3  concerns when they were first notified.  Defendants discussed the matter with the

4  manufacturer of the accused product and did a physical comparison of the accused

5  product with Plaintiff's product.  Upon recognizing the value added by the spring and ball

6  bearing, and after understanding the manufacturer's reasons for non-infringement,

7  Defendants decided to continue selling the accused product.  However, as testified by

8  Plaintiff and Defendants, the Defendants did notify Plaintiff on numerous occasions that

9  they were not selling his product.  Defendants reasonably believed that their product with

10 the spring and ball bearing is substantially different from Plaintiff's product.

11         Then, when the lawsuit was filed by Plaintiff, Defendants decided to remove the

12 accused product from its catalogs and to stop advertising or promoting it.  The result was

13 that Defendants' sales of the accused product immediately dropped from 834 units sold in

14 2009 to 260 units sold in 2010.  See *Teran Decl.,* Ex. C.

15         Because Defendants made efforts to confirm with the manufacturer that the

16 accused product was a "design around" the patent-in-suit, and because Defendants

17 decided to remove the accused product from its catalog and any promotional material

18 upon the filing of the lawsuit, this *Read* factor weighs against enhancing damages.  The

19 Court must recognize that Defendants' sole intent in this case was to compete in a very

20 competitive marketplace.  Defendants did not wish to harm Plaintiff's business.

21 Competition was the only driving force.  Defendants believed they were selling a superior

22 product.  "When the district court reconsiders its finding of willful infringement, it should

23 bear in mind that the patent law encourages competitors to design or invent around

24 existing patents".  See *Ramos v. Biomet, Inc.,* 1995 WL 540291, at *4 (Fed. Cir. 1995).

25         ***8.   Defendants' motivation for harm***

26         Aside from the mere fact that Defendants competed with Plaintiff in the United

27 States, Plaintiff points to no evidence at all whatsoever that Defendants were motivated to

28 harm Plaintiff.  Indeed, Defendants believed they were selling a superior product than

1   Plaintiff's product because of the added value of the spring and ball bearing to maintain
2   the turret stationary.  Defendants' motives were clearly directed towards competing in the
3   market, not towards harming Plaintiff.  See, *e.g., State Indus., Inc. v. A.O. Smith Corp.,*
4   751 F.2d 1226, 1235-36 (Fed. Cir. 1985) (designing around existing patents promotes
5   competition to the benefit of consumers);  *Informatica Corp. v. Business Objects Data*
6   *Integration, Inc.,* 489 F.Supp.2d 1075, 1085 (N.D. Cal. 2007) ("[Defendant's] aggressive
7   attempts to compete are not, by themselves, evidence of bad faith.").

8         Additionally, Plaintiff had failed to present any evidence that Defendants
9   attempted to "steal business" away from Plaintiff.  In fact, the sales data show that, at
10  their best in 2009, Defendants sold 834 pieces compared to Plaintiff's 1,693 pieces.  See
11  *Teran Decl.,* Ex. C.  Then, in 2010 when this lawsuit was filed and Defendants removed
12  the product from their catalog and other promotional materials, Defendants' sales
13  plummeted to 260 pieces while Plaintiff's sales remained flat at 1,703 pieces.  See *Id.*
14  Thus, while Defendants' sales dropped 574 pieces, Plaintiff's sales only increased by a
15  mere 10 pieces.  Clearly, Defendants' sales of the accused product were not harming
16  Plaintiff in any substantial way.  Defendants were not "stealing away" Plaintiff's
17  customers.  Thus, this *Read* factor weighs against enhancing damages.

18          ***9.  Concealment on part of infringer***

19        Finally, Plaintiff accuses Defendants of "lack of candor and evasiveness".  See
20  *Motion,* p.9:8-10.  These accusations are made by Plaintiff without any legal or factual
21  bases whatsoever.  First, Plaintiff alleges that for years prior to this lawsuit, Defendants
22  repeatedly informed Plaintiff that they were not selling Plaintiff's patented pipe.  See *Id.*
23  at p.9:10-13.  As discussed in detail above, this allegation is true and Defendants have
24  never denied it.  In fact, during deposition, Defendant Chander testified:

25            "A:  He said, I'm selling – he told me, You're selling my pipe.
          Q:  Right.
26            A:  And I'm telling him, I'm not selling his pipe.
27            Q:  You told him that?
          A:  Yeah.
28            Q:  Specifically, you said, I'm not selling your pipe?

OPPOSITION TO MOTION FOR ENHANCED DAMAGES      CASE NO. CV10-02225-JAK (JCx)

A:  Yeah.  I'm not selling your pipe.
Q:  Because it clicks?
A:  Yeah.  I'm not – I told him I'm not – I told him and he knows I told him, I'm not selling your pipe.  I told him that.
.
.
.
Q:  You believed that you weren't infringing, because –
A:  I know I wasn't infringing.
Q:  You know you were not infringing?
A:  Yes.
Q:  And when did you know you were not infringing?
A:  I knew it from the beginning.
Q:  Because you understand patent law.  Right?
A:  No, because mine had the spring and the ball and the clicking mechanism."
*See Teran Decl.,* Ex. F..

Clearly, Defendants reasonably believed that the spring and ball bearing that were added to the accused pipe to hold the turret stationary were sufficient to avoid infringement of the patent-in-suit.  Defendants believed that the added spring and ball bearing also added market and functional value to the accused product that made it substantially different from Plaintiff's patented pipe.  Defendants reasonably believed that they were not selling the same pipe that Plaintiff was selling.  Thus, Defendants informed Plaintiff on numerous occasions that they were not selling Plaintiff's patented pipe.

Defendants never even attempted to conceal or lie about this allegation.  Defendants were upfront and truthful from the very beginning of the case, even in deposition.  Defendants did not have any reason to lie, they truly believed that they were not infringing and that they were selling a different pipe.  As such, this *Read* factor weighs against enhancing damages.

Secondly, Plaintiff accuses Defendants of not providing *accurate* purchase orders.  Plaintiff does not accuse Defendants of not producing any purchase orders, Plaintiff merely contests the accuracy of the dates on the documents.  In fact, Defendants produced all of the purchase orders of the accused products.  These purchase orders indicate that Defendants purchased a total of 1,796 pieces of the accused product directly from the

- 21 -

1   manufacturer.  In addition, Defendants produced all their sales invoices for the accused

2   product.  These sales invoices indicate that Defendants sold 1,810 pieces of the accused

3   product to their various customers.  Defendants further explained that the reason they sold

4   14 pieces more than they purchased was because the 14 pieces were free samples from the

5   manufacturer for which Defendants did not purchase, thus they did not issue a purchase

6   order.

7            Plaintiff does not contest the accuracy of the number of pieces purchased and sold

8   by Defendants as shown on the purchase order and sales invoices.  In fact, during trial,

9   Plaintiff stipulated to the accuracy of these figures.  However, Plaintiff does seem to

10  challenge the accuracy of the dates on the documents produced.  Plaintiff alleges that

11  Defendants' "sales of infringing pipes did not match up with [their] purchase orders for

12  any given year".  See *Motion,* p.9:13-16.

13           Plaintiff's allegation is very ambiguous and fails to identify any section in the trial

14  transcript where this issue was raised and addressed.  Defendants have reviewed the trial

15  transcript and also failed to identify a section where this matter is discussed.

16  Nevertheless, it is true that Defendants do not have a method that accurately records the

17  exact date and time of their purchases of products from manufacturers.  However,

18  Defendants do accurately record the number of pieces purchased and sold.  Defendants

19  have to record this information as it affects their accounting records and financial

20  statements.  Defendants also accurately record the date and customer information for

21  every sale.  The date of purchase of products from manufacturers is not always accurate

22  because the various manufacturers from which they purchase are in China, India, and

23  other countries.  A large number of variables are at play when Defendants purchase

24  products from other countries.  However, the number of products and the price they paid

25  are always accurately recorded by Defendants.  Furthermore, Defendants produced all of

26  its purchase orders and sales invoices to accurately disclose the total number of pieces of

27  the accused product they purchased and sold.

28           Finally, Plaintiff alleges that Defendants "refused to produce full and complete

OPPOSITION TO MOTION FOR ENHANCED DAMAGES          CASE NO. CV10-02225-JAK (JCx)

1   financial records, even after the Court ordered him to do so". See *Motion,* p.9:17-20.

2   This allegation is made without any factual support whatsoever.  In fact, the Court should

3   admonish Plaintiff for making such baseless accusation.  The fact is that, during

4   discovery, Plaintiff requested financial statements and balance sheets for Defendants'

5   entire business.  Defendants objected to the request on grounds that it was irrelevant since

6   this lawsuit involved only 1 of over 7,000 products that Defendants sell.  Plaintiff filed a

7   motion to compel that was granted by the magistrate judge.  Immediately after the motion

8   to compel was granted, Defendants produced all of the requested financial statements and

9   balance sheets.  In addition, Defendants produced all of their purchase orders and sales

10  invoices for the accused product.  Plaintiff never contested Defendants' compliance with

11  the Court's order to produce.  Plaintiff never filed any other motion to compel or even

12  addressed any allegations of non-compliance with Defendants or with the Court.  As such,

13  Defendants complied fully with the Court's order and produced all of its financial records.

14      Plaintiff further alleges that:

15          "At trial, facing a subpoena, Mr. Chander confessed that though the same
            existed, he complained that the documents were too voluminous to produce."
16          See *Motion,* p.9:18-20.

17

18      Plaintiff's allegation completely misstates the facts.  As the Court recalls, at trial,

19  Plaintiff did serve Defendants with a subpoena for voluminous records.  Defendants

20  objected and the Court agreed to hear the matter.  However, Plaintiff never submitted the

21  subpoena to the Court for review.  Nevertheless, the Court decided to question Defendants

22  on the matter anyway.  During the Court's inquiry, Defendants reiterated the fact that they

23  had already produced every single purchase order and sales invoice for the accused

24  product.  Defendants were not hiding anything as they believed they were not infringing

25  the patent-in-suit.  In the middle of the Courts inquiry of the matter, without ever

26  reviewing the subpoena, Plaintiff decided to withdraw the subpoena.  The Court did not

27  review the subpoena and never ruled on the matter.

28      As such, despite Plaintiff's baseless allegations, Defendants never concealed

    anything in this lawsuit.  Defendants were upfront and candid throughout the entire

1    lawsuit.  Defendants did not have any reason to hide anything as they truly believed they
2    were not infringing the patent-in-suit.  Defendants cooperated in good faith with the entire
3    process and were truthful every step of the way.  Thus, this *Read* factor weighs against
4    enhancing damages.
5         But, Defendants do request the Court to admonish Plaintiff in the strongest terms
6    for his baseless and despicable accusation that "Mr. Chander lied throughout this
7    litigation and could not bring himself to testify truthfully at trial."  See *Motion,* p.9:22-23.
8    **III.    CONCLUSION**
9         Although the evidence presented at trial fails, as a matter of law, to establish
10   willful infringement under the high *Seagate* standard, the jury's finding of willfulness are
11   advisory for this Court in deciding whether to enhance damages.  As discussed in detail in
12   this paper, the *Read* factors collectively weigh against enhancement of damages.
13        As such, Defendants respectfully request the Court to deny Plaintiff's Motion for
14   Enhanced Damages under 35 U.S.C. §284.
15
16   DATED:  March 12, 2012
17
18
19                                   By: _____
20                                        Louis F. Teran
21                                        Attorney for Defendant Mike
22                                        Novelties, Inc. and Defendant
                                         Manisch Chander
23
24
25
26
27
28